Filed 5/28/13  P. v. Ochoa CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MIGUEL OCHOA,<br><br>    Defendant and Appellant. | B239196<br><br>(Los Angeles County<br>Super. Ct. No. LA065934) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Susan M. Speer, Judge.  Affirmed.

Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Margaret E. Maxwell and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Miguel Ochoa (Ochoa) appeals from his convictions for second degree murder, assault with a semiautomatic firearm, and special allegations that he intentionally and personally discharged a firearm causing death, and personally used a nine millimeter semiautomatic handgun. He claims the trial court erred: (1) when it refused to allow the expert testimony of Bryan Burnett regarding measurements he made from a still screen shot of the video capturing the events in question; and (2) in allowing the prosecution's rebuttal witness, Sergeant Davis, to answer a hypothetical posed to him while watching video footage. As will be discussed below, the claims lack merit. First, the court did not err in finding Burnett unqualified as an expert in videography. The decision to exclude Burnett's testimony was well within the discretionary powers of the trial court. Second, the trial court properly allowed the prosecution to pose a hypothetical to its rebuttal witness, while showing video footage of the events of the case. The hypothetical was predicated on the evidence, the elements discussed were apparent from the video, and Ochoa had ample opportunity for cross-examination of the witness. Accordingly, we affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

**The Parties**

Ochoa had recently been sworn in as a security officer for the Los Angeles Sheriff's Department.[1] As a requirement for his job he underwent firearms training, training on how to approach a vehicle, and training on the necessity of observing a person's hands during any interaction.

Ochoa attended a wedding on the night of August 28th, 2010, at a banquet hall on Lankershim Boulevard in Sun Valley. He attended the wedding with his brother Axel Chavez (Chavez).

---

[1] A security officer is a temporary position. In contrast to a sheriff's deputy who is acting as an officer of the law 24 hours a day, seven days a week, once a security officer is off-duty they have no responsibilities and are average citizens. When a security officer is off-duty, he or she has no legal authority.

Jose Ignacio Arroyo Martinez, Miguel Angel Arroyo Martinez, and Jose Alfredo Arroyo Martinez (collectively referred to as the "Arroyo Brothers") attended the same wedding as Ochoa that night. The Arroyo brothers left the banquet hall and walked into the adjacent parking lot just prior to 2:00 a.m.

**The Crime**

While the Arroyo brothers were attempting to leave the parking lot, Ochoa and Chavez approached their vehicle, and words were exchanged. Although the incident and shooting had been captured on surveillance video, there were no audio recordings. Thus, there is dispute as to what was said between the men.

During this time, Jose Ignacio is shown on the video stepping out of the car and removing his shirt. Miguel and Jose Alfredo followed, and the five men are seen standing outside the car. It further appears that after additional words were exchanged, Ochoa apparently told Chavez to get his gun which had been thrown onto the roof of an adjacent building earlier in the evening. Ochoa then went onto the roof himself, found his gun and cocked it, expelling a bullet from the already loaded chamber. According to testimony, Ochoa shot once in the air, and then shot in the direction of the Arroyo brothers and Chavez. Jose Alfredo was hit by a bullet in his chest and died instantaneously. After the shots were fired, Ochoa came down from the roof, and was seen waving his gun in front of the Arroyo Brothers. There is conflicting testimony as to what was said, as well as whether or not Ochoa placed the gun to Miguel Arroyo's head and allegedly saying "You faggot, I'm gonna kill you. I'm going to f\*\*k you up. F\*\*k you all up." After the shooting, Ochoa and Chavez then left the scene in Ochoa's car.

**The Arrest**

After exiting the parking lot in their vehicle, Ochoa and Chavez drove south on the I-5 freeway. Ochoa's car crashed into the embankment on the Penrose off ramp of the freeway. When a California Highway Patrol (CHP) officer on call for that area arrived, he noticed Ochoa was bleeding from his groin area. Ochoa told the CHP officer that he had been involved in an altercation at a wedding, had left the scene, with another vehicle chasing them and shooting at them. He also told the officer that he gave his gun to

3

Chavez who fled on foot after the accident. Chavez was found several miles from the accident scene, and was taken into custody. He had a handgun tucked into his waistband. Ochoa's gun holds 16 bullets total: one in the chamber, 15 in the magazine.

Ochoa's 9-1-1 telephone call provided another version of the event. During the call he reported that he had been shot at 2820 Lankershim and that the shooter "went out the parking lot and took off." Ochoa then stated that he had accidentally shot himself while reaching for his gun in self-defense. When asked if the men he had been involved with followed him and his brother, Ochoa said they had not, but had shot at his car and into the air.

Ochoa was taken to Holy Cross Hospital, where he was later interviewed by Detective Farell. Ochoa told the detective he had been at a wedding with his brother the night before. When Ochoa and his brother had gone out to the parking lot, they were met by several men in a white truck who told them, "Why don't you get the f**k out of here." Ochoa stated he might have shot himself when he pulled out his gun, after the men started to approach him and his brother. When Ochoa was told that eye witnesses claimed he fired from the roof, and that casings were found on the roof, he continued to maintain that he fired from the ground.

When Ochoa was told that Jose Alfredo had died from a gunshot, he changed his story again. He admitted to getting his gun from the roof and firing from that location. Ochoa admitted that he pointed his weapon at the driver of the truck, but denied aiming at his head. Ochoa said he lied previously because he wanted to describe the events in his favor and because he did not know someone had been shot.

**The Trial**

Ochoa was charged with murder and assault with a semiautomatic firearm. It was further alleged he personally and intentionally discharged a firearm causing great bodily injury, and that he used a nine millimeter semiautomatic handgun.

During the trial, Ochoa introduced expert testimony from Bryan Burnett on gunshot residue (GSR). During his direct examination Burnett described his educational

4

and professional background, in addition to his professional affiliations.[2]  Burnett stated he had a "fascination with electron microscopy" and had a number of publications in that field.  Burnett testified as to the process of lead particles being found on Jose Alfredo's right arm.  He discussed the composition of the bullets, and the resulting residue found after a gun is fired.

Ochoa further attempted to introduce expert testimony evidence from Burnett on measurements Burnett took of still photographs taken from the surveillance footage.  After conducting an Evidence Code section 402 hearing, the trial court voiced skepticism about Burnett's qualification as an expert on videography.  In fact, the next day the court granted the prosecution's motion to exclude Burnett's testimony on the issue.

During the People's rebuttal, Sergeant Michael Davis was called to clarify the training and protocol of the Sherriff's department.  In support of his testimony, the prosecution posed a hypothetical to Sergeant Davis, while the Sergeant was watching the surveillance video from the night in question.

The jury found Ochoa guilty of second degree murder by intentionally and personally discharging a firearm, causing death.  (Pen. Code, § 245, subd. (a).)  The jury further found Ochoa guilty of two counts of assault with a semiautomatic firearm, and found true allegations that he personally used a nine millimeter semiautomatic handgun.  (Pen. Code, § 245, subd. (b), Pen. Code, § 12022.5, subd. (a).)  Ochoa was sentenced to 40-years-to-life in prison.

Ochoa appeals.

## *DISCUSSION*

### I.   The Court's Rulings on Expert Testimony

Ochoa's claims on appeal center on two rulings made by the trial court: (1) the order precluding Bryan Burnett from testifying as an expert about the measurements he

---

[2]   Burnett has an undergraduate degree in Zoology, Masters in Physiology, he is a fellow at the American Academy of Forensic Sciences, and was the past president of the Forensic Consultants Association in San Diego.

5

made from a still photograph of the surveillance footage; and (2) the order allowing the prosecution to play the surveillance video footage while presenting their rebuttal witness with a hypothetical regarding Ochoa's actions that night. We examine each issue in turn.

## A. <u>Videography Expert Evidence</u>

To introduce expert testimony, a party must first prove the proposed expert witness is a qualified expert in the field or subject matter of the testimony. This can be shown through testimony or evidence of "special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) It is left to the trial judge's discretion to determine if that standard has been met. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1175.) We review the trial court's decision to exclude Bryan Burnett's testimony for an abuse of discretion. (*Ibid.*)

Generally, the trial court has broad discretion in its determination of an expert's qualifications. In exercising its discretion, the trial court must determine the expert's qualifications relative to the topic at issue. (*Ramos, supra*, 15 Cal.4th at p. 1175.) The determination is based in part on the occupational experience of the expert. (*Huffman v. Lindquist* (1951) 37 Cal.2d 465, 478 ["He must have had basic educational and professional training as a general foundation for his testimony, . . . ."].) "It is for the trial court to determine, in the exercise of a sound discretion, the competency and qualification of an expert witness to give his opinion in evidence [citation], and its ruling will not be disturbed upon appeal unless a manifest abuse of that discretion is shown." (*Id.*, at p. 476.)

The trial court found Bryan Burnett was not qualified as an expert witness pertaining to the issue of videography and thus excluded his testimony regarding the measurements he made of a still photo of the surveillance footage. As we shall explain, the court did not abuse its discretion in reaching that conclusion.

Burnett's experience focused primarily around his work as a gunshot residue expert. In fact, the trial court conceded this point prior to making its ruling. "I think Mr. Burnett has a – clearly an interest in many, many, many topics, but his true expertise

6

based upon his own C.V. and testimony is in gunshot residue and that was what was represented to the People, that's what he was going to testify to, and he did. And I do find him qualified for that purpose." Burnett's testimony presented his growing "fascination with scanning electron microscopy," which was originally in the field of marine biology and ecology. He later expanded that interest to include "medicines and criminalistics, which include gunshot residue [and] digital imaging." Burnett did not testify to any occupational experience in regards to taking still photographs from a video, and analyzing the photograph by measuring the length of one arm, and comparing it to the length of another. When Burnett attempted to explain the process he used in his analysis of the video images, the judge initially ruled that the photograph and its analysis could be introduced to the jury. However, after reviewing the prosecution's motion to exclude Burnett's testimony which included information about Burnett's experiences and background in the topic, the trial court changed its view on Burnett's qualifications:

> I've read over his C.V., which I did not have yesterday (during the 402 hearing), only heard what he testified to in court. Even then I commented if he was qualified at all, he was marginally qualified.
>
> Looking now at his C.V., it doesn't appear to me that he is qualified. His education certainly is not in the background that would support his testimony regarding the videotape. He has clearly some experience in digital imaging, demonstrating of digital cameras, training on Adobe Photoshop. But aside from that, I think he characterized it as a fascination and an interest in digital imaging. He's certainly not an expert in videography, biomechanics or kinesiology.
>
> I looked at the times he's been qualified as an expert. *He never qualified as an expert in anything to do with digital photography.* Perhaps crime scene investigation, but that's a little vague.
>
> I don't see his—frankly, I don't see he's qualified in this area. As we both now are learning through the discussions, this is quite complicated, the frames per second, what part of

7

the videotape has not been shown, whether it could have been a muzzle flash. *The length of a person's arm based upon enhanced frame from the video is a subject of expertise.*

I think Mr. Burnett has a—clearly an interest in many, many, many topics, but his true expertise based upon his own C.V. and testimony is in gunshot residue and that was what was represented to the People, that's what he was going to testify to, and he did. And I do find him qualified for that purpose.

*I do not find him qualified in the expertise area of videography.* (Emphasis added.)

In our view the court did not err in finding that Burnett was unqualified to offer expert testimony on the matter. The decision reached by the trial court after its review of Burnett's C.V., his past work as an expert witness, and his occupational experiences cannot be deemed as a manifest abuse of discretion. Burnett's work focused primarily on marine biology and ecology. His expertise in the criminal field revolved around gunshot residue, for which the court found him qualified as an expert. However, Burnett's testimony did not express sufficient experience, in the trial court's opinion, to constitute expertise. His experience with digital cameras revolved around the testing of the products, not their manipulation.

None of the authorities Ochoa cites requires a different result. Ochoa's reliance on *People v. Prince* is misplaced. The decision in *Prince* found an expert's testimony to be helpful to a jury, and thus required a determination of whether such testimony would assist the jury. (*People v. Prince* (2007) 40 Cal.4th 1179, 1222.) However, Burnett was deemed not qualified as an expert in the first instance. The trial court's issue was Burnett's qualification, not the substance of his testimony. Ochoa also cites *People v. McDonald* to argue the trial court should not have excluded "evidence that is relevant to the prime theory of the defense . . .in wholesale fashion." (*People v. McDonald* (1982) 37 Cal.3d 351, 372.) This is not the case. The trial court's decision was not to exclude the content of Burnett's testimony, but rather Burnett's ability to testify as to that subject.

8

The court acknowledged the complexity of generating the image and making the measurements, but held Burnett's experience and education were not sufficient to qualify him as an expert. This decision was made within the realm of the court's discretion.

The rules of evidence require an expert be shown qualified prior to his or her testimony at trial. (Evid. Code, §§ 801-802.) Further, *Ramos* elaborated on the effect these rules had on a defendant's constitutional rights. The court held "as a general proposition, criminal defendants are not entitled to any deference in the application of these constraints but, like the prosecution, 'must comply with established rules of procedure and evidence designed to assure both fairness and reliability. . . .' [Citation.] The foundational requirements governing expert testimony are reasonably and rationally formulated to ensure the relevancy of such evidence. [Citation.] They are not 'applied mechanistically to defeat the ends of justice.' [Citations.] Trial courts exercise broad discretion in these matters, consistent with constitutional principles." (*Ramos*, *supra*, 15 Cal.4th at pp. 1175-1176.)

Ochoa additionally claims the trial court's decision was a violation of the constitutional right to present a complete defense. We find this argument without merit. Based on California's rules of evidence and the Supreme Court's ruling in *Ramos*, we find the trial court's decision was within constitutional bounds. To the extent Ochoa felt this evidence was necessary for his defense he could have found another expert—one qualified in the field of videography to present it. He chose not to do that. Thus, the fact that this evidence was not presented was of Ochoa's own doing, not the trial court.

We decline to question the trial court's determination in light of the evidence at hand. We defer to the trial court's conclusion regarding factual findings. Its finding that Burnett was not qualified as an expert to discuss the process of measuring the still photograph was not beyond the court's discretion. Burnett's testimony was properly excluded by the trial court.

## B.     Video Hypothetical

Ochoa's second claim is the trial court erred in allowing Sergeant Davis to testify to the hypothetical the prosecution proffered, while watching the surveillance video

depicting Ochoa's actions. Sergeant Davis was called as a witness to rebut Ochoa's claim his actions were the result of his sheriff's officer training. Sergeant Davis provided a background of the training the officers receive, noting the distinction between on-duty, and off-duty officers.

We review a trial court's decision regarding hypothetical questions for an abuse of discretion. (*Graves v. Union Oil Co. of California* (1918) 36 Cal.App. 766, 770.)

A valid hypothetical posed to a witness must be based on "facts rooted in evidence." (*People v. Ward* (2005) 36 Cal.4th 186, 209.) The hypothetical presented to Sergeant Davis was based on the facts of the case. He was asked to assume for their truth, the actions of an officer, similar to what Ochoa admitted to doing. He opined on whether the actions described in the hypothetical and shown by the video violated Sheriff's Department policy. Sergeant Davis was even shown a video to clarify the actions he was asked to consider.

While a witness may be asked a hypothetical based on the facts supported by evidence, the hypothetical is not without bounds. The hypothetical cannot ask the witness to opine as to the actions of the specific defendant at trial. (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.) The hypothetical posed to Sergeant Davis asked him to discuss the actions of an officer of the Sheriff's Department, not specifically whether Ochoa's actions were legally justified. Should the jury have found Sergeant Davis' testimony compelling and inferred the shooter was not justified in his response, "that is merely unfortunate for [Ochoa], [and] not a reason to exclude probative and permissible expert testimony."[3] (*Id.*, at p. 1049.) Consequently, Sergeant Davis' testimony did not

---

[3]     Further, assuming Sergeant Davis' hypothetical went to the ultimate issue to be decided, his resulting opinion about the hypothetical actor's actions would not be inadmissible. "Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (*People v. Vang, supra,* 52 Cal.4th at p. 1049.) In fact, expert testimony is still permitted even if it does go to the ultimate issue, because the jury still plays a significant role. (Evid. Code, § 805.) The jury decides the weight, if any, to attribute to the expert's testimony, and the jury determines whether the facts assumed in the hypothetical are the

10

relate to the ultimate issue in the case, and instead served to rebut Ochoa's testimony that his actions that evening were based on his training with the Sheriff's department.

Ochoa claims the showing of the video in conjunction with the hypothetical posed to Sergeant Davis was a violation of Ochoa's right to a fair trial. While the trial court acknowledged the unnecessary use of an already confusing video, the court allowed Ochoa to cross-examine Sergeant Davis using the video as well, and indeed did. The ability to cross-examine the witness removed any unfairness that might have arisen from Sergeant Davis' testimony. Additionally, acting in its capacity as fact finder, the jury was free to give whatever weight it deemed proper to Sergeant Davis' direct and cross-examination testimony.

In short, we find the trial court acted within its discretion when it permitted Sergeant Davis to view the video while answering the hypothetical posed to him. [4]

## II.    Cumulative Error

Ochoa contends while the errors he asserts are individually sufficient to warrant reversal, taken together they violate appellant's state and federal constitutional rights to due process and a fair trial. We disagree. As discussed elsewhere here, we find no error individually on these claims. Thus his claim of cumulative error necessarily fails as well. (*People v. Avila* (2006) 38 Cal.4th 491, 608.)

---

actual facts of the case, placing any significance to discrepancies if found. (*People v. Vang, supra,* 52 Cal.4th at pp. 1049-1050.) The video he was shown, which he based his decision in part on, had been discussed and analyzed by prior witnesses. Both parties had opportunities to discuss what could be seen, as well as their respective recollections of what occurred. Thus, Sergeant Davis' testimony would be inadmissible even if it went to the ultimate issue to be determined by the jury.

[4]     In the alternative, had the decision to alter the video been an abuse of the trial court's discretion, we find any error was harmless. The evidence against Ochoa was strong.

11

*DISPOSITION*

The judgment is affirmed.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**

**ZELON, J.**